Before I turn to the calendar, I want to welcome Judge Lawrence Filardo of the Western District of New York, who's donating his time to sit with this circuit. And we're all grateful. The pleasure to be here. Thank you. Now I'll turn to the calendar. I am informed that all parties are here. And in one case, parties have asked for rebuttal on cross appeals, and I will grant those. So let's start with Eyshinskiy v. Kendall. Good morning. My name is Brian Glass. I am the attorney for Mr. Eyshinskiy, a former assistant principal at Flushing High School. This case was brought because it essentially was very similar to the case of Fierro, Joseph Fierro. When I saw Joseph Fierro in the district court that had come up to the circuit, there were quite a few parallels as far as an assistant principal refusing to engage in misconduct on behalf of the administration, or succumb to pressure to rate teachers ineffective or rate them with corporal punishment allegations that were not deserved. And basically, we believe this case is very similar to that. It was just Judge Shinlin at the district court in that case had found that, had gone through a very complex First Amendment analysis, and did find that this was a matter of public concern that should... Look, it may well be a matter of public concern, and I'm not a bit fond of Garcetti, but I find it very hard to say that this isn't exactly what Garcetti was about. Here is somebody speaking about things which have public concern, but which are essentially part of the job, who could have spoken outside and publicly. That's not determinative, but she could have done. So why isn't this what Garcetti told us, and then subsequently our circuit applied it even more broadly with me dissenting? But isn't that really what we're stuck with? Well, I think it's quite parallel to the Jackler case, which this circuit has held recently. Jackler stands for this proposition of a police officer who's speaking out about refusing to issue a false report. He did nothing more than do that within the context of his job duties, and that case was dismissed on a motion to dismiss, but restored by the Second Circuit. So I think there have been distinctions. Fiero did not speak outside the context of his job as an assistant principal. He did not speak outside his role as a police officer. What he was being urged to do was not something illegal. He was told to be much stricter in how he drew up teaching reports. Now, you know, that may be right or that may be wrong, but it's hard to say that that's the same thing as telling somebody to do something that is illegal as was involved in the case you tell you. Well, I believe that brings us into the Matthews case, the Craig Matthews case, another case that was thrown out on a motion to dismiss that was restored by the Second Circuit, and that case talked about the concept of quota. Now, you might argue that the quota system by itself is a good or bad thing, but Mr. Matthews spoke out about that, and that was found to be protected as well. But he spoke out about it. It wasn't him saying that he wanted to give different evaluations to the teachers. Let me put it this way. Suppose one of the math teachers that your client is evaluating gives A's to everybody who takes her math class, and your client goes to the math teacher and says, look at everybody in the class can't be an A student. She says, everybody's an A student, and this happens semester after semester after semester, year after year after year, and he says your students are doing very poorly in their standardized testing, just as the school did poorly in its evaluations. Isn't she subject to some discipline for giving A's to every single student, and wouldn't she have the exact same argument that your client has if she were told to apply stricter standards? Well, I think there's a distinction. I think we're talking about this concept of quota. We're not doing individualized evaluations here. I mean, Mr. Oshinsky has rated teachers ineffective in the past that he finds ineffective. The pressure in this case was that the political pressure of rating a school. This was in the newspapers that summer quite a bit, this renewal of superintendency, and there was a lot of political media about whether this is proper to be rating these large high schools, these teachers ineffective across the board. So I think on an individualized basis, it would be a different case. It's interesting that if you read in the respondent's brief, they talk about this is not a case where he's alleging that to falsify specific evaluations for a group of math teachers, or there's a policy of lowering the ratings of a wide range of teachers. This is a policy case. He's saying there's the state standards. I'm applying the state standards. They're telling me just to rate everyone lower. They're not criticizing him about evaluating specific teachers. There's not a single anything in this record that's going to show that he was asked to say, look at this case, this case. You're overrating in this case. Same thing in my example. The teacher's giving everybody A's. We're not saying to the teacher, well, Janie or Jimmy or you can't give everybody A's. Just like we're saying to this fella, you can't give everybody effective. What's the difference? I think the difference is we're talking about state. We're talking state and local measures are part of the new process. So you're looking at the state and local state evaluation methods now, and his ratings were consistent with those state evaluations. So we are implicating state concerns rather than just an individualized school setting. So I believe part of his argument is, look, these across the board. It's consistent with my ratings. What they're asking me to do is just willy-nilly rate people ineffective as a matter of policy, because we feel this is a failing school. There must be failing teachers. Actually, they were asking him to tell his supervisor before he uploaded the grades onto the app. Isn't that what they asked? That was the second part. Initially, it was simply he was subject to these staff meetings with higher level officials from the DOE who are basically sort of intimidating all the assistant principals. We don't want you rating teachers. Did the DOE tell him to withdraw his truthful ratings? Well, the consequence of rating teachers truthfully was the unsatisfactory rating which he received. This man had a stellar career for 23 years and was considered one of the highest rated APs in the system, and all of a sudden he became ineffective. So it's constant. All of that depends on whether what he did originally was something that could be complained about in a First Amendment way, whether what they did after is bad from a federal point of view. Whatever happens with contract in the state is a different matter, but it's bad from a federal point of view if the original action taken was, in fact, improper in a First Amendment kind of way. That's where I still have problems. When I was dean, I would tell my teachers from time to time, look, you gave almost everybody a D. Were they really that bad? Sometimes they'd say yes. Sometimes they'd say, well, let me think about it again. Now, I might have been wrong, but was this something outside the scope of the employment, even if it did have some public interest or not, in terms of Garcetti? Well, I believe it's analogous to the Matthews Dakota system. It's an objectionable policy. The reason it made the papers was because there was sort of this global way to rate teachers, lower standards. The evaluation system was very controversial at the time, and this is right within the . . . No doubt, to me, that this is a controversial issue and that there is something . . . I'm glad the guy raised it and all that. My question comes back to Garcetti. . . . . You would agree that there's a difference between your situation and the situation where somebody like your client goes to the newspapers and says there is a problem with rating teachers in this district, right? I mean, there is more of a public element when you do that, but I think the distinctions in Matthews and Jackler have kind of overcome those distinctions if you read those cases closely. I mean, Jackler did nothing more. He says, I'm not going to write the report, and then he got the consequence. He did nothing publicly beyond just refusing to do that at work. I think this goes beyond Fierro a little bit, because Fierro was just objecting on an individualized basis to rate one teacher on an individualized basis ineffective. Mr. Oshinsky was speaking up on I'm refusing to do this. No, but they forced Officer Jackler to withdraw what he thought was a true report. They never forced Mr. Oshinsky to withdraw the ratings. Well, I don't believe they asked him to withdraw the report. He refused, and the consequence to him was the loss of the job. Here, they didn't ask him. I mean, they didn't say you need to change those ratings, but immediately when he refused to do that, he got the ineffective or this first unsatisfactory of his career. I think Jack was very similar, because Jack didn't really change his behavior. He just refused to do it, and the consequence was loss of job. I know your time has expired, but would you take me through your analysis of why there's a public interest here? Well, I think it's this concept of failure to succumb to government pressure to engage in wrongful conduct, and I think that's what's being recognized in a case like Jackler. It's this idea that if he's in line with state and local standards, the pressure on him as a public employee has been recognized as of the matter of public concern. And so I think if you get past that prong, then we get into the issues of fact, and all they're really asking for at this point is a chance to develop the record. I mean, this may be revisited on summary judgment. I think cases like Jackler, and I mean, they're difficult cases, because there's certainly to the court, there's a sense of improper, you know, he was improperly disciplined for trying to do the right thing. And we'd like to just create the record broader. We may bring in some of the press articles. I think we could develop this record further factually. You know, Judge Cote decided this case in one sentence. If you really look at it, he just says, she says, it's distinguishable, Fierro, because he's not alleged that he's ever directed to engage in blatantly wrongful conduct. And he is alleging that he was directed to engage in blatantly wrongful conduct. So they're just trying to characterize this as it just disagrees with the rating system. This is beyond that. This is a policy of rating teachers willy-nilly. They're not saying, here, you're playing Danielson improper, which is the rating system. They're not saying, you know, in this individual case, they're showing evidence in specific cases that he wasn't doing it properly. They're just saying, globally, you're just doing it wrong. You have to rate these teachers lower across the board. I think it would be a different case if they spent the time showing him that the overrating was really not in line with their new standards. But they're not saying that. They're just saying, you've got to rate everybody lower in this situation. I think through discovery, we would bring that out. And that's why I really wanted to get to discovery, to depose the renewal superintendent and depose some of the higher level people to really bring out what the policy was, that this is not an individual case where you're saying, all right, you're overrating teachers on an individualized basis. Let's look at what you're doing. They're not doing that. They're just saying across the board, everyone should be ineffective. At the council, you've reserved two minutes for rebuttal. Thank you. We'll hear from the defendants, all of them. Good. Good morning, Your Honors. Julie Steiner, the attorney for the appellees. Drawing all reasonable inferences in favor of the plaintiff, plaintiff did speak, did not speak as a private citizen, but as a public employee pursuant to his official duties. Your Honor hit it on the head when you pointed out that this case is on all fours with Garcetti. And putting aside the majority opinion in Weintraub, your dissent hits it again. This is a case where the plaintiff was paid to do the among his many jobs as the assistant principal, he was required to rate his many different math teachers in his department. When he was questioned about his effective ratings, he defended them. He felt that he was being personally attacked, that his professional judgment was under fire. And he said no. When he was asked to put the written evaluations before the main principal, the head principal, he refused to do so, saying this is not subject to the principal's approval. It's my professional judgment. He was not acting as a citizen when he went about his job of rating his math teachers. And as your Honor pointed out in your dissent in Weintraub, the employer has the right to ensure that its official communications are accurate and demonstrate sound judgment. And that is exactly what the principal of this school was Not a single page or word in their complaint alleges that he was asked to falsify across the board any evaluations, nor can you even read this complaint to read that he was asked to lower them. He was asked at best to use a more stringent standard to better assess his teachers. Not every teacher could be rated effective. But as opposing counsel pointed out, he lost his job. He lost his job, but not because he was doing what because he was not doing what he was supposed to be doing, which was using a better, more stringent standard. He does not have the right under Garcetti and other cases in this court to do his job as he sees fit. But haven't we, in the last set of cases, cut away at Garcetti and cut away at Weintraub in a way that I might well have liked, whether the Supreme Court would let us get away with it is another matter. But haven't we, in these last set of cases cited by opposing counsel, in fact cut away a fair amount? In these cases, Jackler and Matthews might have cut away at it, but it does not affect the outcome of this case. In Jackler, the police officer was specifically refused to retract his statements. He was asked to retract a truthful statement, which he refused to do. And it had a civilian analog. Him lying under oath can subject him to criminal liability. This is not the case here. Again, he was not asked to either withdraw his, what he believed to be a truthful evaluation or an objective evaluation using a different standard that the principal wanted him to do. And nor would he be subject to criminal liability for doing anything by using a different standard, which, in fact, on paragraph 33 of the complaint, the principal mentioned, aha, using this other standard, the Danielson standard, the teachers are now being rated a little bit more stringently. That's exactly what was happening. That was not what was happening in Jackler and exactly what they wanted him to do here. Just apply a stringent standard. The problem with his evaluations here, though, was that he was giving everybody an effective rating. Correct. So, so he's effectively, he's really being told, don't give everyone an effective rating. But he's not being told to lie. He's being told to use, and that cannot be inferred from his complaint. What can be inferred is that he was asked to use a more stringent standard. And if he was. He says, he says, I think every one of these teachers deserves an effective rating. He's being told you can't give all these teachers an effective rating. How is that not being told to lie? Because he's not being, he's, he's, he thinks under his professional view, these teachers are outstanding and he's claiming that he's following the state and city standards of evaluation. But the principal is saying there are other standards to that would warrant a lower rating. That's not lying. That's using a different standard. Did the principal give him a different set of standards specifically to apply? That is, did he say the problem is that you are testing on this set of standard here is do this, this, this, and this differently? Or did he just give him a generic? Well, it's not clear from his complaint. He doesn't allege that he doesn't allege that he was told to lie or falsify. He wasn't also, he also did not allege that he was given a different set of standards. However, what was alleged again at paragraph 33, he points out that at this meeting where the principal attended, it was the cabinet meetings and the principal cited numbers showing that there was an increase in the number of teachers rated developing and ineffective using this Danielson framework for teaching. That demonstrates that there's a different standard that can be applied that will warrant lower ratings. Not saying that these were lies or false statements, but it is a different standard that he is suggesting should be applied to these teachers. The other more recent case, the Matthews case that my adversary pointed out, that is a case where the police officer was questioning policy, which was not part and parcel of his officer. He was simply supposed to make arrests and things of that nature. When he said, this quota system is downright changing the way, you know, arrests are being made. This court held that that was not a, he was not doing it within his job responsibilities. This is not a questioning of a policy case. This is not Matthews. This is simply- Aren't you discussing a change in policy by substituting different standards? No, he's not. He's saying, no, no, no. Excuse me. I'm sorry, Your Honor. The Matthews police officer was saying this policy of this quota policy is improper because it changes or affects the way arrests are made. The only thing alleged in plaintiff's complaint, which however we read it favorably to him, is that he was asked to use a different standard at best. He thought and disagreed that that's not the way it should be. He's not saying that this system-wide policy is affecting teachers. He's saying, I don't like the way you are saying to me that my teachers should be rated. He kept saying throughout his complaint, it's my professional judgment that you are attacking. I don't have to give you, Principal Chin, my evaluations before they are uploaded. That's my professional judgment. All of this refers, reverts to his professional judgment. And again, under Garcetti- It is the teacher's job to question the policy about teaching standards in a way that it is not part of a policeman's job to question whether you have a quota. That is, the two are not necessarily the same. A cop on the beat may have nothing to say about a quota system. A teacher is after all, not simply an employee, but part of a wider system. Correct. His job may well be setting the standards. Yes, Your Honor. Continue. I just want to reiterate again that this case is on all fours with Garcetti. Everything that we discussed this morning demonstrates that the plaintiff's mere disagreement with the policy or the new standard that he believes should be used on his evaluations does not give him a license to carry out his job as he sees fit. Just because he thinks, as it was held in the Glitman case, that there might be a colorable argument that this was improper. So again, this all boils down to a plaintiff doing exactly what he was told to do. He did not like that his professional judgment was being questioned, and this was all part and parcel of his duties that does not warrant First Amendment protection. Do you agree that it would be a different case if the plaintiff went to the news media and said the standards that are being Yes, possibly. In fact, I think we mentioned that in our brief. He uses the internal mechanisms. He went through the chain of command, went right to his principal. He did not do anything outside. So yes, that would be a different situation, but that's not what we have here. Thank you, Your Honor. Thank you. Mr. Glass, you've retained two minutes for rebuttal. Well, I think the questioning of counsel has suggested there are potentially factual issues that can be developed here and revisited at a later stage. The policy issue was not in his personal interest to not rate to do what they're saying. Think about it. You have a flawless career, and he's putting himself at risk by saying this is wrong as a matter of policy, as a matter of principle. It would actually have been the safer thing for him to just said, you know what? I'll do what they say. I'll rate some of my teachers lower. So we don't have, and then was he told to lie? I think that's a factual question. We can determine that. I think he was told to lie. They're saying, no, he's not. He's just not rating teachers more stringently. In fact, we'll show that he was essentially told to lie, because it so closely follows these meetings with high level people where intimidation was used to say, if you don't do this, you're going to get a lower rating. And that's exactly what happened. So I think she's drawing distinctions without a difference. She's just trying to characterize this as he's a lone wolf who wants to do what he wants to do. No, he's speaking up and saying, this is wrong for all teachers. This is a matter of policy, as Matthews with the quota system. He doesn't set policy. Absolutely, he doesn't. But he's saying, this is wrong, an evaluation of state law, and he got retaliated for that. But he's not saying, if you went to the news media or went to someone outside the chain of command and said these things, I might agree with you. But he's not saying those things. He's simply saying, I want to rate these teachers, as part of my job, effective. I'm rating them effective. He's not making a statement about the policy. He's acting within the policy, right? No, I think he's making a statement about the policy. Whether he's going to outside sources, that's a different distinction. And that comes up in some of the other cases as to whether, certainly it would make his case stronger if he had done that. But I don't think that's the factor that makes this case a loss. And I think that can be developed as well. But I think we have other cases out there, like Fierro, and we have Jackler, which people are not going outside to the press. I mean, certainly it would make it an easier case. But I don't think that's the one factor. And I think if you look at these closely, you'll have to sort of sort out all these little distinctions. But I think if you actually put Jackler, Fierro, and Matthews together, we have elements of all three here. And I think it's enough for at least factual discovery to allow us to develop the record further. Thank you. Thank you both. We'll reserve decision.